**Dated: June 23, 2021**

**The following is ORDERED:**





Janice D. Loyd
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 19-11982-JDL |
| Genevieve Jean Prieto, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| James K. Brown, derivatively on behalf | ) | |
| of HS Investment Group, LLC, an | ) | |
| Oklahoma Limited Liability Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 20-01065-JDL |
| | ) | |
| Genevieve Jean Prieto, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER
DETERMINING DEBT NON-DISCHARGEABLE**

**I. Introduction**

This proceeding is before the Court for decision after a trial conducted on May 19,

2021.  This is an adversary proceeding to liquidate an alleged debt and, to the extent

liquidated, except that debt from discharge.  The Plaintiff brought this action derivatively[1]

on behalf of a Limited Liability Company ("LLC") which conducted business as a Domino's

Pizza franchise in which, at the time of the filing of Debtor's bankruptcy, the Plaintiff and

the Debtor were the only Members and the Debtor was the Manager.[2]  Plaintiff asserts that

without his knowledge or consent the Debtor sold the business and utilized the proceeds

belonging to the LLC for her own personal use and benefit.  The Plaintiff alleges two claims

for relief: (1) an embezzlement claim under 11 U.S.C. § 523(a)(4) and (2) a willful and

malicious conversion claim under 11 U.S.C. § 523(a)(6).[3]

   After hearing the arguments of counsel, considering all the documentary and

testimonial evidence and weighing the credibility of the witnesses, the Court makes the

following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Fed.R.Civ.

P., made applicable by Rule 7052 of the Fed.R.Bankr.P.[4]  For the reasons set forth herein,

[1] Standing is the "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197 (1975). Defendant/Debtor has not challenged the Plaintiff's derivative standing, nor could she.  A plaintiff in its capacity as a member of a limited liability company has derivative standing to pursue a cause of action on the LLC's behalf where the LLC has allegedly been harmed by the fraudulent misappropriation of funds by the manager where the only other members of the LLC are the debtor and a member controlled or related to the debtor. *In re D'Anello*, 477 B.R. 13 (Bankr. D. Mass. 2012); *In re Whittle*, 449 B.R. 427 (Bankr. M.D. Fla. 2011).

[2] At the time HS Investment Group, Inc. was converted from a corporation to an LLC in 2011, the initial members of the LLC were the Debtor, the Plaintiff and William K. and Patricia J. Slater, the Debtor's parents.  By the time of the filing of bankruptcy, both of Debtor's parents were deceased.

[3] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

[4] All future references to "Rule" or "Rules" are to the Federal Rules of Bankruptcy Procedure or to the Federal Rules of Civil Procedure made applicable to bankruptcy proceedings, unless otherwise indicated.

the Court finds that the Plaintiff has met his burden of proof that the debt owed him on behalf of HS Investment Group, LLC ("HSI") is non-dischargeable. A separate judgment shall be entered pursuant to Rule 9021.

## II. Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b) and 157(a) and (b) and the Order of Reference of the United States District Court for the Western District of Oklahoma as Local Rule LCvR 81.4 (a). This is a core proceeding that a bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(I) as it concerns a determination as to the dischargeability of a particular debt. To the extent that it may ever be determined to be a matter that the bankruptcy judge may not hear and determine without consent, the parties nevertheless have consented to such determination by a bankruptcy judge. See 28 U.S.C. § 157(c)( 2); [Doc.1, *Complaint*, ¶ 4; Doc. 4, *Response to Complaint*, ¶ 39]. Venue is proper under 28 U.S.C. § 1409.

## III. Findings of Fact[5]

1. In 2006 HS Investment Group, Inc., an Oklahoma Corporation, operated the Guthrie, Oklahoma Domino's Pizza franchise. The corporation was owned 51% by the Debtor and 49% by the Debtor's parents, William and Patricia Slater. RTW Investments, LLC ("RTW"), an Oklahoma limited liability company, owned 51% by the Debtor and 49% by the Plaintiff, James K. Brown, was formed to operate the Domino's Pizza franchises in Yukon and Mustang, Oklahoma.

---

[5] The parties stipulated to undisputed facts in the *Final Pretrial Order* entered on May 13, 2021 [Doc. 33]. Those undisputed facts are deemed admitted, and to the extent not explicitly stated in this Opinion and Order, are incorporated herein by reference.

3

2.  Beginning in 2008 the Plaintiff and/or limited liability companies owned by him started making a series of loans to HS Investment Group, Inc.  The Promissory Notes representing these loans were renewed and consolidated over the following years, with the last Renewal Promissory Note in the amount of $378,721.37 dated October 10, 2012, with the Maker being HS Investment Group, LLC, and the Payee being JKD Investment Company, LLC, a limited liability company owned by the Plaintiff.[6]  The Renewal Promissory Note called for monthly payments of $3,195.87.

3. In 2011, the Debtor as President of HS Investment Group, Inc. caused it to be converted to an Oklahoma Limited Liability Co. under the name of HS Investment Group, LLC.  Under the Operating Agreement of HSI, dated January 1, 2011,[7] members of the LLC were Debtor, William and Patricia Slater and the Plaintiff. [Tr. Ex. 1].  Under the Operating Agreement the Debtor held a 51% interest, each of her parents held an 8% interest and Plaintiff held a 33% interest.  The Debtor was the Manager of HSI.  By 2013 the membership interests in HSI were changed to reflect the Debtor's interest at 51%, the Plaintiff at 47% and each of the Debtor's parents at 1% each.

4.  The Operating Agreement also made clear that the Manager had a duty of loyalty to HSI and its members, including to not use HSI property for her personal benefit:

---

[6] The Promissory Note admitted into evidence was not signed. [Tr. Ex. 31].  Debtor testified that she refused to do so.  For purposes of the matters at issue in this adversary, the lack of a signature is without legal significance.  The statute of frauds is an affirmative defense which must be specifically pled pursuant to the applicable Rules of Civil Procedure made applicable by Rule 7008. The statute of frauds was not placed at issue by the Debtor neither in her pleadings nor in the *Final Pretrial Order*.  Moreover, HSI (by the Debtor) made payments on the Note for several years, and such performance on its behalf takes the Note obligation outside the statute of frauds.

[7] The Plaintiff executed the Operating Agreement on March 21, 2011.

4

**17.5 Managers' Duty to Avoid Improper Personal Benefits**

    (a) <u>Personal Benefit-Definition</u>. For purposes of this Agreement, a personal benefit shall mean cash or anything else of value that a manager obtains (i) from any third party in connection with the manager's performance of services for the LLC; or (ii) from any self-interested transaction affecting the LLC.

    (b) <u>Duty to Disclose Personal Benefits, Etc.</u> If, in connection with the manager's conduct of the LLC's business or internal affairs, a manager receives a personal benefit, the manager shall promptly disclose this benefit to the members and shall transfer it to the LLC.

    (c) <u>Condition for Retention of Personal Benefits.</u> A manager may retain a personal benefit if expressly authorized to do so by this Agreement or by  majority vote of the disinterested members.

**17.6 Managers' Duty in Using LLC Property, Etc.**

    No manager shall make use of LLC property, cash or services (including LLC information or intellectual property) or of the manager's position as a manager for any purpose except to benefit the LLC unless:

        (a)  The manager first advises the members of the manager's intent to do so; and
        (b)  The use is approved by majority vote of the disinterested members.

[Tr. Ex. 1].

    5.  By 2012 HSI was operating Domino's Pizza stores in Oklahoma City, Mustang and Yukon, Oklahoma.  During 2014, HSI sold the Mustang and Oklahoma City stores, leaving the Yukon store the only one in operation.

    6.  In conjunction with the conversion of HSI to an LLC in 2011, the name on the bank account at MidFirst Bank was changed to that of the LLC with the Debtor and the

Plaintiff as the only authorized signatories. [Tr. Ex. 14]. In 2014, without the knowledge or consent of the Plaintiff, the Debtor executed a Resolution of Limited Liability Company advising MidFirst Bank that she was the sole member of HSI and that she was the only one with signatory authority on HSI's account. [Tr. Ex. 15].

7. Between 2012 and 2017 the company, acting through the Debtor, continued to make monthly payments to the Plaintiff under the Renewal Promissory Note. Due to HSI's financial difficulties, there were several months during that time during which the Plaintiff agreed to accept interest only payments. The last several payments made in 2016 were in the full amount of $3,195.87. The last payment was received by the Plaintiff by a check dated March 24, 2017, on March 27, 2017. [Tr. Ex. 30].

8. From 2012 forward the Debtor was in control of the operations of the Yukon Domino's Store with the Plaintiff taking a "passive" role. Other than occasionally requesting, but not always timely receiving, financial reports, Plaintiff did not participate in the day to day operations of the business.

9. In late 2016 Debtor began negotiations for the sale of the Domino's Yukon store.[8] It is not disputed that the Debtor never advised Plaintiff of the pending sale of the store. Email correspondence between Debtor's (and HSI's) attorney dated January 3, 2017, makes clear that there was an impending sale, that the Debtor had not told Plaintiff about it and did not want HSI's attorney to tell Plaintiff about it. [Tr. Ex. 38]. In an email between Debtor and counsel dated January 11, 2017, at 6:17 PM, Debtor wrote the following:

_____

[8] No evidence was introduced as to the actual date when negotiations began. There is evidence of emails to and from the Debtor and her attorney, Bruce Klein, dated January 11, 2017, that such negotiations may have begun on or before November 2016.

6

> Well I will need to do something with the company when it's said and done. The sale price will pay off all of the secured debt and payables *but none of the unsecured debt...but guess who isn't secured? He Who Shall Not Be Named.* So I will need a lawyer to deal with that (and whatever else is required whether that be dissolving the LLC or bankruptcy)....

(Emphasis added) [Tr. Ex. 38]. The Debtor testified at trial that the "He Who Shall Not Be Named" unsecured creditor referred to was the Plaintiff.[9]

10.    Around the same time that Debtor was seeking to sell the Domino's store, on November 3, 2016, she formed a new manager-managed, single-member limited liability company, RQ Fashions, LLC ("RQ Fashions"), under which she as Trustee of Genevieve Prieto Living Trust was the only member and manager. [Tr. Ex. 20].

11.    By an Asset Sale Agreement dated January 30, 2017, Debtor and HSI, as sellers, sold the Yukon Domino's Store to AJO Pizza LLC for the price of $600,000. [Tr. Ex. 23]. Among other provisions, the Asset Sale Agreement provided as follows:

**II. Seller's Obligation To Creditors**

> A. Seller hereby warrants that it has made a full and complete disclosure to Buyer of all indebtedness, obligations and liabilities of the Business and the Seller with respect to Business, including, without limitation, any trade obligations.
>
> B. Seller represents and warrants that all bills, claims and payables that accrued prior to the Closing Date will be settled

---

[9] It is not unusual, nor necessarily wrongful, for a distressed debtor to pay secured creditors and not pay unsecured creditors (and seek to discharge the debt in bankruptcy). That common situation, however, is not all that occurred here. Mr. Brown, the owner of probably the largest unsecured creditor, JKD Investment, was also a 49% owner of the Company. Upon the sale of the business the Debtor was legally obligated to pay the secured creditors, the unsecured creditors and then divide any equity remaining on a 51% to 49% basis. It is undisputed that what Debtor did was to use the sale proceeds to pay secured debt and most, if not all, remaining proceeds for her own use and benefit (her own "equity") rather than pay unsecured debt and any possible equity to the 49% owner, Mr. Brown.

in a timely manner.  Sellor also agrees that any and all past due obligations will be made current as of the Closing date.
                                    * * * *
D. Seller agrees that it will promptly pay all obligations existing with respect to the Business as of the Closing Date that are not expressly assumed by Buyer. ***

[Tr. Ex. 23].

12.  It is not disputed that the Debtor did not tell Plaintiff of the sale.  Plaintiff testified that he did not learn of the sale until probably late February 2017 when he was advised of it by a Domino's franchisee in Stillwater, Oklahoma.[10]  In mid-2017 Plaintiff and Debtor did discuss the possible dissolution of HSI, with the Debtor advising the Plaintiff that she had instructed HSI's attorney, Bruce Klein, to begin that process.  Plaintiff requested that Debtor keep him advised as to the dissolution process. [Tr. Ex. 18].  A formal dissolution process was never undertaken.

13.  As stated above, the sale of the business occurred on January 30, 2017. [Tr. Ex. 22].  At closing, from the gross sales price of $600,000.00 payments were disbursed to five secured creditors leaving a balance of $301,364.27.  This amount was wired to

_____

[10] Plaintiff's recollection as to when he first learned of the sale is probably not accurate.  There is in evidence in undated text messages between Plaintiff and Debtor in which Plaintiff is still asking about possible dissolution proceedings for the Company and inquiring as to when he could expect his monthly Note payments for April and May. [Tr. Ex. 18].  In those text messages the Debtor tells the Plaintiff that her mother died on April 8, her funeral was on April 22, her father was ill, and that those personal matters had prevented her from attending more closely to business matters.  Later in a text exchange the Debtor indicates that she and Plaintiff could do the dissolution proceedings without an attorney and that's "separate from payments issue." [Tr. Ex.18].  Public records indicate that Debtor's mother died on April 8, 2017, and the funeral was on April 22, 2017, more than two months after the business had been sold.  From the tone of the text messages and the discussion of the late April and May payments, it appears that the Plaintiff did not have knowledge of the sale prior to May 2017.

HSI's account at MidFirst Bank. [Tr. Ex. 22]. The Debtor then transferred $190,000.00 from the HSI's account to her father's account upon which Debtor was also a signatory. The $190,000.00 was then transferred from the father's account to the account of RQ Fashions, LLC dba LulaRoe Genevieve Prieto at BancFirst. The account had been opened on February 1, 2017, with the Debtor as the Manager with sole signatory authority. [Tr. Ex. 19].

14. On January 31, 2017, the day after the closing of the sale of the Domino's store, Debtor for her own personal use purchased a 2016 Range Rover for a price of $59,900.00, using $26,000.00 from HSI's account as a down payment. [Tr. Ex. 26.].

15. From the funds remaining in HSI's account, on February 4, 2017, Debtor purchased a diamond ring for the price of $6,918.88. The Debtor admitted this was a purchase from HSI's funds for her personal use.

16. The Plaintiff's expert witness, a Certified Turnaround Professional, testified that his examination of HSI's books and records indicated that from January 1, 2017 to August 31, 2017 (all but one month of which was after the sale of the business) the Debtor had received cash disbursements of $32,913.50. There was no testimony specifically indicating the reason for these cash payments. [Tr. Ex. 5].

17. There is in the record, copies of checks or withdrawal slips for approximately $7,000.00 in checks made payable to the Debtor personally. [Tr. Ex. 7-10]. For example, one check in evidence in the amount of $4,000.00 payable to the Debtor the day following the sale closing raises questions; however, there was no testimony specifically as to the purpose for which the check was written. Debtor testified that she often had to use her personal funds to pay HSI's expenses for which she would reimburse yourself. HSI did

issue checks for several months following the sale of the business, with the bank account being closed by a withdrawal in the amount of $8,448.94 on August 25, 2017, and payable to the Debtor. [Tr. Ex. 10].

## IV. Discussion

### A.  Exceptions to Discharge-General Considerations

The "central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654 (1991).  Not all debts however, are extinguished as we are reminded in the oft quoted mantra of dischargeability actions, that of the "basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" *Lamar, Archer &, Cofrin, LLP v. Appling,* ___U.S.___ , 138 S.Ct. 1752 (2018) (quoting *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212 (1998); *Grogan*, 498 U.S. at 286 ("But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'").

In order to effectuate this "fresh start" policy of bankruptcy relief, exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor.  *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997); *Chevy Chase Bank, FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 782 (10th Cir. BAP 1998); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir. 1995), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305 (1995). It is a well-established rule that exceptions to discharge are to

be construed strictly against a creditor and liberally in favor of the debtor. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998).

The burden of proof for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654 (1991). The burden of establishing the fact by a preponderance of the evidence "requires the [judge] 'to believe that the existence of a fact is more probable than its nonexistence before [she] may find in the favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 622, 113 S.Ct. 2264 (1993). Thus, a preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it. *Greenwich Collieries v. Director, OWCP*, 990 F.2d 730, 736 (3rd Cir. 1993) *aff'd* 512 U.S. 267, 114 S. Ct. 2251 (1994). In a case where "the evidence is evenly balanced, the [party with the burden of persuasion] must lose." *Id.*, 512 U.S. at 281.

## B. Dischargeability under § 523(a)(4)- **Embezzlement**

The First Claim for Relief alleges an embezzlement claim against the Debtor under § 523(a)(4). Section 523(a)(4) states as follows:

> (a) A discharge under section 727...of this title does not discharge an individual debtor from any debt –
> ***
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

There being no definition of embezzlement in § 523 or elsewhere in the Bankruptcy Code, the courts find that Congress wrote with the common law in mind. *Neder v. United States,* 527 U.S. 1, 23, 119 S.Ct.1827 (1999); *In re Sun,* 535 B.R. 358 (10th Cir. BAP

2015) ("Embezzlement is the 'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.")(quoting *Klemens v. Wallace (In re Wallace,* 840 F.2d 762, 765 (10th Cir. 1988).  The definition of embezzlement in the context of non-dischargeability requires three elements: (1) property rightfully in possession of a known owner; (2) nonowner's appropriation of the property to a use other than that to which he was entrusted; and (3) circumstances indicating fraud. *In re Arellano,* 574 B.R. 251, 256 (Bankr. D. N.M. 2017); *In re Morrow,* 2017 WL 2062859, at *5 (Bankr. D. N.M. 2017) (citing *Board of Trustees v. Bucci, (In re Bucci),* 493 F.3d 635, 644 (6th Cir. 2007);*Transamerica Commercial Finance Corp. v. Littleton (In re Littleton),* 942 F.2d 551, 555 (9th Cir. 1991).[11]

The evidence is unrefuted that after the payment of specified debt at the closing of the sale of HSI the Debtor, as manager, took possession of the remaining $301,000.00 of sale proceeds.  It is also not refuted that the Debtor, rather than first using the $301,000.00 to pay HSI's creditors,[12] used the great bulk of, if not the entire, proceeds for her own personal use and benefit.  The Debtor testified that $190,000.00 from closing was paid to her father to repay loans which he had made to the Company.  There was no evidence introduced by the Debtor to substantiate any loans or other consideration made by her

---

[11] Some cases within the Tenth Circuit have employed a five-element criteria for embezzlement in a non-dischargeability case: "1) entrustment (property lawfully obtained originally); 2) of property; 3) of another; 4) that is misappropriated (used or consumed for purposes other than that for which it was entrusted); 5) with fraudulent intent." See e.g., *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002); *In re Palilla*, 493 B.R. 248, 252 (Bankr. D. Colo. 2013); *In re Bringhurst,*569 B.R. 814 (Bankr. D. Utah 2017). The Court sees no meaningful difference in the tests, as the three-element test incorporates all the elements contained in the five-part test.

[12] HSI's 2017 Federal tax return indicates debt of $20,760 in accounts payable and long-term debt of $603,230.00 (mortgages and notes payable in one year or more). [Tr. Ex. 2, pg. 2364].

father justifying the $190,000.00 payment.  Even if there was a legitimate debt owed to her father it was indisputably unsecured and not entitled to any more preferential treatment than any other creditor of HSI, including JKD Investment Company, LLC.  Moreover, the funds simply "passed through" her father's account, upon which Debtor was a signator, to the account of RQ Fashions, the LLC of which Debtor was the sole member and manager. The Court cannot help but view the payment of the $190,000.00 from HSI's account, to the father's account and then to the RQ Fashions account as anything other than an attempted subterfuge for funding the Debtor's new business for which she had laid the groundwork months before the sale of the Domino's Pizza business.

The Debtor's use of HSI's funds to pay $6,900 for the diamond ring, $26,000 towards the purchase of a personal vehicle, and the $8,440 which closed out the Company bank account seven months after the business was sold are all without any doubt the wrongful appropriation of HSI's funds with which Debtor was entrusted.  It is likely that many more of the Debtor's expenditures, particularly checks to her around or soon after the sale of the business were wrongfully appropriated,[13] but, given the proper burden of proof, there is not sufficient evidence for this Court to so find.

In order to find embezzlement, however, it is not sufficient that the Debtor has misappropriated for her own use and benefit the funds entrusted to her. She must also have done so with fraudulent intent. "[F]raud implied in law or which may arise in the

---

[13] For example, Plaintiffs expert testified to his analysis of HSI's Statement of Cash Flows for the period of January 1 to August 31, 2017, which shows payments to Debtor of $32,913.50 and credit card payments of $20,373.43. [Tr. Ex. 5]. However, at trial there was no evidence established as to what these funds were used for, i.e., whether they were for business expenses related to the company's operations. The Court cannot rely on the its supposition that these funds were misappropriated.

absence of bad faith or immorality" is not sufficient. *In re Johnson,* 477 B.R. 156, 169 (10th Cir. BAP 2012); *Kukuk*, 225 B.R. at 787 (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986) (abrogated in part on other grounds by *Grogan*, 498 U.S. 279, 111 S.Ct. 654). The debtor must have acted with the subjective intent to deceive the creditor. *First National Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 674 (10th Cir. BAP 2005), *aff'd,* 2006 WL 1875366 (10th Cir. 2006). Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances. *Cribbs*, 327 B.R. at 673; *Copper v. Lemke (In re Lemke),* 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Fowler Brothers v. Young (In re Young),* 91 F.3d 1367,1375 (10th Cir. 1996)); *In re Graham*, 600 B.R. 90, 95 (Bankr. D. Kan. 2019). The "totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses." *Id*. at 95-96.

In the context of embezzlement, "[i]t is the knowledge that the use is devoid of authorization... that makes the conversion fraudulent and thus embezzlement." *In re Sherman,* 603 F.3d 11, 13 (1st Cir. 2010); *In re Melo*, 558 B.R. 521, 558 (Bankr. D. Mass. 2016); *In re Bell*, 498 B.R. 463, 483 (Bankr. E.D. Pa. 2013) ("Simply put, the unauthorized withdrawal of corporate funds for compensation by an officer of a corporation, *committed with fraudulent intent* is embezzlement."). In embezzlement cases, "fraudulent intent may also be inferred from a course of conduct such as a 'pattern of concealment and nondisclosure.'" *In re Marshall,* 623 B.R. 123, 135 (Bankr. E.D. Pa. 2020) (quoting *In re Bell*, 498 B.R. 463, 476 (Bankr. E.D. Pa. 2013). Here, there is overwhelming evidence that

the Debtor knew that both her conduct in taking the funds for personal use was without authorization (in contravention of the terms of HSI's Operating Agreement) and that she concealed use of the funds from the Plaintiff.

In her capacity as the manager of HSI, Debtor was entrusted with responsibility for the corporate finances and financial affairs; however, the Operating Agreement prohibited the manager from "making any decision concerning a material LLC matter without first reasonably consulting about the matter with the other managers or, if there are no other managers, with the members." [Tr. Ex. 1, ¶ 16.6].   At the risk of stating the obvious, the sale of the entire assets of the LLC was a "material matter" concerning HSI requiring member approval.   The Debtor signed the Operating Agreement, and she testified that she was aware of its contents, including the duty of loyalty to not use HSI's property for own personal use without consultation with the other members.   It is not disputed that the Debtor, in contravention of the terms of the Operating Agreement, used HSI's funds for her own benefit and without the authorization from the Plaintiff as a member.   This disregard of the Operating Agreement may be indicative of the fraudulent intent required to prove embezzlement. See e.g. *Wallner v. Liebl  (In re Liebl),* 434 B.R. 529, 537 (Bankr. N.D. Ill. 2010) (finding the disregard of the LLC's rules indicated fraudulent intent); *In re Spivey*, 440 B.R. 539, 546 (Bankr. W.D. Ark. 2010).

The requisite fraudulent intent or scienter was also established by the Debtor's concealment of the sale of the business from the Plaintiff in his capacity as a member. The Debtor admitted in her testimony that she never told the Plaintiff that she had sold the business.  If any further evidence of her fraudulent intent was necessary, it is also found

15

in her January 11-12, 2017, emails to HSI's attorney regarding the secrecy with which the sale must be kept from unsecured creditors, among which the Debtor identified as "He Who Shall Not Be Named." [Tr. Ex. 38]. The Debtor admitted in testimony that it was the Plaintiff to whom she was referring.

In short, the Court is persuaded that Plaintiff has presented evidence sufficient to sustain the embezzlement claim against the Debtor under § 523(a)(4), and that the Plaintiff, derivatively on behalf of the LLC, was damaged by that embezzlement.

## C. Dischargeability Under § 523(a)(6)- *Willful and Malicious Injury - Conversion*

The Plaintiff's Second Claim for Relief purports to allege a claim for willful conversion under § 523(a)(6). Section 523(a)(6) states as follows:

> (a) A discharge under section 727... of this title does not discharge an individual debtor from any debt –
> ****
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

While not specifically mentioned in the statute, it is clear that conversion of a creditor's property interest can support a non-dischargeability claim under § 523(a)(6). *In re Longley,* 235 B.R. 651, 657 (10th Cir. BAP 1999); *Bank of Utah v. Auto Outlet, Inc. (In re Auto Outlet, Inc.)*, 71 B.R. 674, 676 (Bankr. D. Utah 1987) ("Although this section does not specifically mention conversion, 'willful and malicious injury' was intended to include 'willful and malicious conversion.'"). As stated by the Supreme Court in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct.151 (1934), decided under subsection (6) of § 17(a) of the Bankruptcy Act of 1898, the precursor to § 523(a)(6):

> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this

16

> exception.... But the willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice.

While federal bankruptcy law governs the dischargeability of a claim under § 523(a)(6), state law determines whether an act falls within the tort of conversion. Under Oklahoma law, "conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Welty v. Martinaire of Oklahoma, Inc.* 1994 OK 10, 867 P.2d 1273, 1275; *In re Hentges,* 373 B.R. 709, 730 (Bankr. N.D. Okla. 2007). As discussed above with regard to the claim for embezzlement, there is no doubt that evidence of the Debtor's misappropriation of the proceeds of the sale of HSI's assets for her own personal benefit supports a claim of conversion of the property belonging to HSI. The question then becomes whether such a conversion was "willful and malicious" for the purposes of § 523(a)(6).

The Plaintiff has the burden to prove, by a preponderance of the evidence, the elements of § 523(a)(6). *Grogan*, 498 U.S. at 291. Those elements are: (1) either he or his property sustained an injury; (2) the injury was caused by the debtor; (3) the debtor's actions were "willful;" and (4) the debtor's actions were "malicious." *In re Deerman,* 482 B.R. 344, 369 (Bankr. D. N.M. 2012); *In re Mosley*, 501 B.R. 736, 743 (Bankr. D. N.M. 2013); *In re Musgrave*, 2011 WL 312883 (10th Cir. BAP 2011). Section 523(a)(6) requires that the debtor's actions be both willful and malicious. *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (holding that there must be proof of both a "willful act" and "malicious injury" to establish non-dischargeability under § 523(a)(6)).

17

To be "willful", a debtor must have intended both the act and the resulting harm. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974 (1998). There the Supreme Court ruled that the word "willful" requires proof of a "deliberate or intentional *injury*, not merely a deliberate or intentional act which results in injury." *Id.* The standard is an objective standard, akin to that of an intentional tort. When injury occurs due to recklessness, or is "neither desired nor in fact anticipated by the debtor," it is not within the scope of § 523 (a)(6). *Id.* at 62. A "willful act" is therefore one in which "the debtor must 'desire...[to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it.'" *Moore*, 357 F.3d at 1129 (quoting *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley),* 235 B.R. 651, 657 (10th Cir. BAP 1999)). However, the Court in *Geiger* did not define malicious conduct. Therefore, the element of malice requires application of Tenth Circuit law.

The Tenth Circuit has held that the proof necessary to establish "malice" is an act that occurs when the debtor intends the resulting injury or takes action that is substantially certain to cause the injury. *Moore,* 357 F.3d at 1129; *Via Christi Regional Medical Ctr. v. Englehart (In re Englehart*), 2000 WL 1275614 at *3 (10th Cir. 2000) ("The 'willful and malicious injury' exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause the injury or at least believed it was substantially certain to occur."); *In re Cagan*, 2010 WL 3853316 (Bankr. D. N.M. 2010) (the requisite intent to harm is evaluated under a subjective standard that focuses on the debtor's state of mind; the debtor must have desired the consequences of his or her act or have intentionally acted believing of the consequences of the act were substantially

certain to result from it."). The "substantially certain" formulation has been adopted in most post–*Geiger* decisions, and is consistent with the *Restatement (Second) of Torts* § 8A (1965) definition of 'intent' to "denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *In re Longley,* 235 B.R. 651, 657 (10th Cir. BAP 1999); *Moore*, 357 F.3d at 1128 (10th Cir. 2004).

Courts have found that the two-part test under § 523(a)(6) for a finding of malicious and willful can be "condensed into a single inquiry of whether there exists either an objective substantial certainty of harm or a subjective motive to cause harm on the part of the debtor." *Musgrave,* 2011 WL 312883, at *11 n. 85 (citing *Geiger*, 523 U. S. at 61-62); See also *Williams v. International Brotherhood of Electrical Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003). Is there evidence that the Debtor willfully and maliciously, as defined by the above law, converted the Plaintiffs property? The Court believes there is.

As noted above with regard to the claim of embezzlement under § 523(a)(4), direct evidence of the debtor's state of mind is often hard to find because debtors will not often admit to malicious intent. Similarly, cases under § 523(a)(6) often lack such direct evidence, and thus the plaintiff must rely on circumstantial evidence to prove the debtor's state of mind. This is one of those rare cases, however, where Debtor admitted (and documentary evidence supported) that she intentionally concealed the sale of HSI from the Plaintiff, HSI's only other member, and admitted that she used between $200,000.00 and $300,000.00 in proceeds thereof for her own use and benefit rather than for the benefit of

19

other, particularly unsecured, creditors of HSI.  Her testimony made clear to the Court that her misconduct was motivated by her dislike or distrust of the Plaintiff because of his relationship with her former husband, that he was a "passive" owner of the company interested only in receiving his Note payments and not in its business operations, and that it was the Debtor that bore the brunt of HSI's day-to-day operation including not always receiving a salary, thus she was entitled to the proceeds.  There was evidence of her resentment toward the Plaintiff, but there was no evidence produced by the Debtor that she didn't do intentionally what the Plaintiff alleged.  Her "defense" was that "[t]he testimony and evidence presented at the trial of this matter on May 19, 2021, prove nothing more than the fact that the Defendant, Miss Prieto, is a failed businesswoman." [Doc. 40, pg. 2]. Suffice it to say, the failure of a business is not justification for a company's principal to sell the business without telling the other shareholders and pocketing the funds for her own use and benefit rather than paying creditors.  The record is replete with evidence to support a finding that the Debtor was guilty of willful and malicious conversion.

## V. Damages

Under Oklahoma statutes, the damages for conversion  is presumed to be the value of the property at the time of the conversion with interest from that time and a fair compensation for the time and money expended in pursuit of the property. Title 23 O.S. § 64.  In embezzlement cases there would be a loss to the extent of the property misappropriated. *In re Hanif,* 530 B.R. 655, 671 (Bankr. E.D. Mich. 2015) (noting that damages for embezzlement and common law conversion equal the value of misappropriated property); *In re Patel*, 551 B.R. 488, 496 (Bankr. D. N.M. 2016) (damages

20

for embezzlement are generally equal to the value of the misappropriated property).

The Court finds that the Plaintiff has proved damages in the amount of $190,000.00 for the funds utilized by the Debtor to invest in her new business, $26,000.00 for the down payment on her new vehicle, $6,918.88 to purchase diamond jewelry and $8,448.94 to close out the company's account in August 2017, for a total of $231,367.82. As noted above, there are probably additional funds which were misappropriated; however, there was not sufficient evidence as to their use to award them as damages. Accordingly,

**IT IS ORDERED**, that the claims made by the Plaintiff, James K. Brown, derivatively on behalf of HS Investment Group, LLC, an Oklahoma Limited Liability Company, in the amount of $231,367.82, are hereby determined to be a **NON-DISCHARGEABLE DEBT** of Debtor/Defendant, Genevieve Jean Prieto**.**

**IT IS FURTHER ORDERED** that pursuant to Rules 7058 and 9021, a separate Judgment will be entered in favor of the Plaintiff, James K. Brown, derivatively on behalf of HS Investment Group, LLC, an Oklahoma Limited Liability Company.

# # #

21